[Cite as *State v. Hornschemeier*, 2012-Ohio-2860.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-110466<br>TRIAL NO. B-1002411 |
| Plaintiff-Appellee, | : | |
| vs. | : | *O P I N I O N.* |
| MARTHA HORNSCHEMEIER, | : | |
| Defendant-Appellant. | : | |


Criminal Appeal From:  Hamilton County Common Pleas Court

Judgment Appealed From Is:  Affirmed in Part, Sentences Vacated in Part, and Cause
                                          Remanded

Date of Judgment Entry on Appeal:  June 27, 2012


*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Paula E. Adams*, Assistant
Prosecuting Attorney, for Plaintiff-Appellee,

*Michaela M. Stagnaro*, for Defendant-Appellant.


Please note:  This case has been removed from the accelerated calendar.

**Sᴠʟᴠɪᴀ Sɪᴇᴠᴇ Hᴇɴᴅᴏɴ, Judge.**

{¶1}   Defendant-appellant Martha Hornschemeier was indicted for abduction, unlawful restraint, and two counts of kidnapping.  A jury acquitted her of the kidnapping offenses, but found her guilty of abduction and unlawful restraint.  The trial court sentenced her to five years of community control for each offense.  She now appeals.

### *Sentencing*

{¶2}   Before we consider Mrs. Hornschemeier's assignments of error, we address an issue with respect to her sentence.  The record reveals that the trial court stated at Mrs. Hornshemeier's sentencing hearing that it was merging the abduction offense with the unlawful-restraint offense because they were allied offenses of similar import.  But in its sentencing entry, the trial court, nonetheless, imposed sentences of community control for both offenses.  As a result, the trial court committed plain error in separately sentencing her for the offenses, when it had previously stated that it was merging the unlawful-restraint offense with the abduction offense.  *See State v. Warner*, 1st Dist. No. C-110198, 2012-Ohio-716; *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, 922 N.E.2d 923, ¶ 26 and 31.

{¶3}   Consequently, we sua sponte vacate the sentence for the unlawful-restraint offense and remand this case to the trial court to correct the mistake in the judgment entry by nunc pro tunc entry to reflect what it had actually decided at the sentencing hearing.  *See State ex el. Womack v. Marsh*, 128 Ohio St.3d 303, 2011-Ohio-229, 943 N.E.2d 1010, ¶ 14; Crim.R. 36.  We affirm the trial court's judgment in all other respects.

### *The Background Facts*

{¶4}   This is a difficult case.  Mrs. Hornschemeier is the mother of three adult children.  At the time of the trial in this case, her daughters, Christina Seabolt and Jennifer Hudgens, were 32 and approximately 42 years old, respectively.  This case involves Mrs. Hornschemeier's multi-handicapped son, John, who was 41 at the time of trial.

{¶5}   On April 7, 2010, Mrs. Hornschemeier's dispute with a neighbor resulted in her arrest.  While she was being taken into custody, City of Montgomery Police Officer Dan Long learned that John, who was unable to care for himself, was inside her house.  Officer Long went through the house's back door and called for John.  He heard noises from inside the home.  He continued to call for John and followed the sounds that John was making.

{¶6}   Officer Long described the house as being very dark inside, with no ventilation.  He noted that the outside temperature was about 75 degrees, and that the inside temperature was "quite a bit hotter."

{¶7}   Officer Long could hear John upstairs, so he proceeded up the stairs to the second floor.  The stairs led to a hallway that ran the length of the house.  The hall was very dark, there were no windows or ventilation, and the doors to the adjoining rooms were locked.

{¶8}   Officer Long could see a male figure on the floor at the end of the hall.  As he got closer, he discovered John sitting on the floor with a chain shackled to his ankle by a padlock.  The chain led under a padlocked door, where it was attached to an iron, "immovable bed."   A portable toilet sat in the hall.

{¶9}   Officer Long did not attempt to pull the shackle off of John's ankle.  The officer testified that "[i]t was obvious to me at the time that there were not enough extra links to remove it and also I figured with a padlock on it[, ] that it was on there to stay. * * * [C]learly there was not enough slack to remove it and I didn't know if there would be any

damage to his leg. So I did not attempt to remove it." When members of the fire department arrived, the shackle was removed with bolt cutters. Officer Long did not notice any marks on John, but noted that he appeared to be emaciated.

{¶10} Once John was freed from the chain, he was evaluated by a medical team and released into his father's care.

{¶11} Jenny Flowers of the Hamilton County Developmental Disabilities Services ("HCDDS") met John at his father's home the following day. John allowed Ms. Flowers to look at his legs and ankles. She testified that she saw a "red and purplish area, ring around each of his ankles."

{¶12} According to Ms. Flowers, the agency had received a complaint in late 2009 from Mrs. Hornschemeier's daughter, Christina Seabolt. Ms. Flowers had been unable to reach Mrs. Hornschemeier by telephone, so she had gone to her home. Ms. Flowers had explained to Mrs. Hornschemeier that they had received a complaint, and that her role was simply to verify John's health and safety. Mrs. Hornschemeier had refused to allow Ms. Flowers to meet John.

{¶13} On cross-examination, defense counsel asked Ms. Flowers if she was aware that other allegations had been made to her agency about Mrs. Hornschemeier in the past. When counsel asked her about a complaint made in 1992, the state objected on the basis that an allegation made 18 years earlier was not relevant. After the court overruled the state's objection, Ms. Flowers testified that "Christy Hornschemeier" (who was 14 years old at the time and later became known as Christina Seabolt) had made an allegation to police about her mother.

{¶14} Defense counsel asked Ms. Flowers who had made allegations against Mrs. Hornschemeier in 2002 and in 2009, and she responded that it had been Ms. Seabolt.

4

Following the 2009 complaint, Ms. Flowers had advised Ms. Seabolt that HCDDS services were voluntary, so Ms. Flowers could not force her way into her mother's home.

{¶15} Christina Seabolt testified that her brother John was nine years older than she was. She did not recall making a report to HCDDS in 1992. She recalled that she had been visited by social workers from the time she was nine years old until she was 15 years old. She testified that on several occasions during that period, her mother had physically restrained her by her hands, or by both her hands and ankles, for ten to 12 hours at a time. Ms. Seabolt said that at the time, her mother had bolted her and John in her mother's room on a regular basis when she went to work or was gone from the home.

{¶16} Ms. Seabolt indicated that when she had called HCDDS in 2002, she had hoped that it would offer services to her mother to help her in her care for John. She admitted that no action, criminal or otherwise, had been taken against her mother at the time. Ms. Seabolt had called HCDDS in 2009 after noticing redness and chafing around John's wrists. She had been concerned that John was being restrained.

{¶17} Ms. Seabolt testified that until she was about six years old, her mother would lock her, her brother, and their older sister, Jennifer, in the basement while their mother went to work. The basement had doors that led outside to an enclosed courtyard. According to Ms. Seabolt, the door was bolted closed, so they would have had to climb over a wall to get out.

{¶18} Ms. Seabolt's older sister, Jennifer Hudgens, testified that she is 11 months older than John. According to Ms. Hudgens, when she was about ten years old and her sister Christina was about six months old, her mother had worked long hours to support the family. While her mother was at work from early morning until evening, she would lock Jennifer and her siblings in the basement. The children were not allowed to leave the basement or to leave the house. Their mother provided food for them to eat during the day.

According to Ms. Hudgens, their mother would not allow the children to have their shoes in the basement because she did not want them to leave.

### The Defense

{¶19} During her trial testimony, Mrs. Hornschemeier described John as being multi-handicapped with special needs. John has slow gross motor functions, severe communication delays, and borderline autism. Mrs. Hornschemeier said that he has been brain damaged since birth.

{¶20} Until her arrest in April 2010, John had lived with his mother. She and his father had divorced in 1982. According to Mrs. Hornschemeier, she was John's "sole consistent caregiver."

{¶21} She testified that one day, she had asked John to sit and watch a television show until she returned in about 15 minutes. She had begun to clean the gutters on the house. When she went back into the house, John was not there. She frantically searched and found John about four blocks away from the house, standing in the middle of the street.

{¶22} After that incident, Mrs. Hornschemeier testified, "I started using the loop." She said that she had constructed the "loop" herself. She had wrapped plastic grocery bags around a chain for cushioning. She would fit the chain around John's ankle, and would then place a padlock on it. Whenever she padlocked the chain on John's ankle, he wore a sock under the chain.

{¶23} Mrs. Hornschemeier described the "loop" as "a communication device, and a teaching device, to help John to monitor his own behavior and to think first before he acted."

{¶24} According to Mrs. Hornschemeier, John either waited for her to take the padlock off or he would slip the loop off of his foot. She said that "John was able to contort his feet. He's double jointed."

{¶25} Mrs. Hornschemeier denied that she had ever restrained her daughter Christina or John. She denied that she had ever put them in a room and bolted the door. She said that she had locked her children in the basement because her ex-husband had "tried to rape [her] in the kitchen while he was choking [her] to death."

{¶26} According to Mrs. Hornschemeier:

If the – my children were in the kitchen, and my ex-husband also would threaten the children, I – whether they had shoes on or not, I would quickly tell them to go in the basement, and I would lock the door for their protection, and I didn't want them to see me being raped. And I did not – if he did kill me, I did not want them to be witnesses, because it might help him spare them later.

{¶27} She denied that her children had been in the basement for long hours while she was at work.

### *Other Acts Evidence*

{¶28} In her first assignment of error, Mrs. Hornschemeier argues that the trial court erred by permitting testimony regarding other acts into evidence. Specifically, she challenges the court's admission of testimony by her daughters that she had locked them up and had restrained them during their childhood.

{¶29} Mrs. Hornschemeier did not object to this testimony, thereby waiving all but plain error. Crim.R. 52(B); *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). "Plain errors or defects affecting substantial rights may be noticed although they were not

brought to the attention of the court." Crim.R. 52(B). To notice plain error, we must first find that an error occurred, that the error was an obvious defect in the trial proceedings, and that the error affected the outcome of the trial. *State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306, ¶ 16; *State v. Eafford*, ____ Ohio St.3d ____, 2012-Ohio-2224, ____ N.E.2d ____, ¶ 11.

{¶30} Generally, in a criminal prosecution, the state is not permitted to present evidence of other crimes or acts to prove that the defendant acted in conformity with her bad character. But Evid.R. 404(B) and R.C. 2945.59 allow evidence of other bad acts as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake.

{¶31} In this case, the daughters' testimony, while inadmissible to show their mother's propensity to restrain her children, was nonetheless admissible for another purpose. To prove the kidnapping charge for which she was acquitted, the state was required to prove that Mrs. Hornschemeier had purposely, by any means, restrained John of his liberty. The testimony by her daughters was permissible as proof of her intent to restrain John, and to rebut the defense claim that her intent had not been to restrain him, but to simply communicate with him. Moreover, in opening statement, defense counsel had opened the door to the testimony when he referred to complaints made to HCDDS from 1992 to 2009 by Mrs. Hornschemeier's youngest daughter about her mother's abusive treatment of John. Consequently, the trial court did not commit plain error in admitting the testimony. And in any event, the evidence of restraint in this case was overwhelming, thus rendering any error harmless. We overrule the first assignment of error.

### *Exclusion of Voluminous Records*

{¶32}  In her second assignment of error, Mrs. Hornschemeier argues that the trial court erred by not admitting into evidence records from HCDDS that pertained to John.  At trial, the state argued that the records should not be admitted because, of the hundreds of pages in the HCDDS records spanning nearly 20 years, only about six pages were relevant to the trial issues.  The state maintained that the jury would be confused by the evidence.

{¶33}  " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Evid.R. 401.  However, Evid.R. 403(A) states, "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

{¶34}  "[T]he admission of evidence lies within the broad discretion of the trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created material prejudice.  Thus, our inquiry is confined to determining whether the trial court acted unreasonably, arbitrarily, or unconscionably in deciding the evidentiary issues about which [the appellant] complains."  (Citations omitted.) *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 62.

{¶35}  In this case, the trial court noted its concern that the jury would have felt compelled to review the entire HCDDS record, even though much of the record was irrelevant and would confuse the issues before the jury.  We cannot say that the trial court abused its discretion in refusing to admit the voluminous HCDDS records.  Consequently, we overrule the second assignment of error.

### *Assistance of Counsel*

{¶36} In her third assignment of error, Mrs. Hornschemeier argues that she was denied the effective assistance of trial counsel. Specifically, she contends that she was prejudiced by counsel's failure to object to the other-acts testimony.

{¶37} The failure to make objections is not, by itself, enough to sustain a claim of ineffective assistance of counsel. *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 168; *State v. Holloway*, 38 Ohio St.3d 239, 244, 527 N.E.2d 831 (1988). Reversal of a conviction for ineffective assistance requires that the defendant show that counsel's performance was deficient and that the deficient performance prejudiced the defense. *See Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus. To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the proceeding would have been different. *Strickland* at 694; *Bradley* at paragraph three of the syllabus.

{¶38} Trial counsel's representation is presumed effective, *Strickland* at 690, and this presumption is not overcome here. Because the other-acts testimony was properly admitted, there was no basis for counsel to object. Consequently, Mrs. Hornschemeier cannot demonstrate that counsel was deficient for failing to object to the other-acts testimony. Accordingly, we overrule the third assignment of error.

### *Weight and Sufficiency of the Evidence*

{¶39} In her fourth assignment of error, Mrs. Hornschemeier challenges the weight and sufficiency of the evidence upon which her conviction was based. In a challenge to the sufficiency of the evidence, the question is whether after viewing the evidence in the light

most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. In reviewing a challenge to the weight of the evidence, we sit as a "thirteenth juror." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). We must review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice. *Id.*

{¶40} To find Mrs. Hornschemeier guilty of abduction, in violation of R.C. 2905.02(A)(2), the jury had to find that, without privilege to do so, she knowingly, by force or threat of force, restrained John's liberty under circumstances which created a risk of physical harm to him.

{¶41} " 'Privilege' means an immunity, license, or right conferred by law, bestowed by express or implied grant, arising out of status, position, office, or relationship, or growing out of necessity. R.C. 2901.01(A)(12). Force is defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). Physical harm includes any injury, "regardless of its gravity or duration." R.C. 2901.01(A)(3).

{¶42} In this case, the jury considered evidence that Mrs. Hornschemeier had shackled her adult son by the ankle in a second-floor hallway while she was outside of the home, causing redness around his ankle. The jury's apparent determination that the restraint in this case exceeded any privilege that Mrs. Hornschemeier may have had by virtue of being John's mother was supported by the evidence. We hold that a rational juror, viewing the evidence in a light most favorable to the state, could have found that the state had proved beyond a reasonable doubt that Mrs. Hornschemeier had committed the offense

of abduction. Therefore, the evidence presented was legally sufficient to sustain her conviction.

{¶43} Although Mrs. Hornschemeier explained that the shackle was simply a communication loop that her son could easily escape, the weight to be given the evidence and the credibility of the witnesses were primarily for the jury to determine. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). Moreover, our review of the record does not persuade us that the jury clearly lost its way and created a manifest miscarriage of justice in finding Mrs. Hornschemeier guilty of the offense. Accordingly, we overrule the fourth assignment of error.

### Conclusion

{¶44} Consequently, we sua sponte vacate the sentence for the unlawful-restraint offense and remand this case to the trial court to correct the mistake in the judgment entry by nunc pro tunc entry to reflect what it had actually decided at the sentencing hearing. We affirm the trial court's judgment in all other respects.

Judgment accordingly.

SUNDERMANN, P.J., and FISCHER, J., concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.