[Cite as *State v. Wills*, 2013-Ohio-4507.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                                          :

    Plaintiff-Appellee                            :              C.A. CASE NO.    25357

v.                                                             :              T.C. NO.    11CR2574

DEWAYNE A. WILLS                               :              (Criminal appeal from
                                                                              Common Pleas Court)

    Defendant-Appellant                        :

                                                              :

. . . . . . . . . .

**O P I N I O N**

Rendered on the _____11th_____ day of _____October_____, 2013.

. . . . . . . . . .

CARLEY J. INGRAM, Atty. Reg. No. 0020084, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

ROBERT ALAN BRENNER, Atty. Reg. No.  0067714, P. O. Box 341021, Beavercreek, Ohio 45434
      Attorney for Defendant-Appellant

. . . . . . . . . .

FROELICH, J.

      **{¶ 1}**  Dewayne A. Wills was convicted after a jury trial of three counts of felonious assault, each with a firearm specification, and one count each of unlawful restraint, discharging a firearm on or near a prohibited premises, and inducing panic.  After a bench

trial, the trial court also convicted him of having a weapon while under disability. The trial court sentenced Wills to an aggregate term of 21 years in prison, and he was ordered to pay $42,000 in restitution to the Dayton Police Department, $350 in restitution to Linda Turner, and court costs.

{¶ 2} Wills appeals from his conviction. For the following reasons, the trial court's judgment will be affirmed in part and reversed in part, and the matter will be remanded for the proper imposition of court costs and for the trial court to consider whether consecutive sentences are appropriate under R.C. 2929.14(C)(4) and, if so, to enter the proper findings on the record.

## I. Factual and Procedural History

{¶ 3} According to the State's evidence, in late July 2011, Wills was the former boyfriend of Taja Martin; Martin had ended the relationship a couple of months before. The pair had a three-year-old daughter, T.W., and a two-year-old son, D.W. The children lived with Martin, but Martin permitted Wills to see the children. Martin's grandparents, Talmadge and Linda Turner, took the children to see Wills and brought them back to Martin.

{¶ 4} At approximately 1:00 a.m. on July 28, 2011, Wills came to see Martin at the residence of Martin's sister, Lameycia Martin, on Wexford Place in Dayton. Several other adults and children were there. Wills told Martin that he wanted to see his children, and an argument ensued. Several of Martin's family members were called and came to the residence. Talmadge and Linda Turner drove to Wexford Place in a 15-passenger van that they had for their church. In a separate vehicle, Martin's mother and step-father, Alicia and Carl McJunkins, came with Martin's ten-year-old brother, G.M., Martin's aunt, Tyecia

McHenry, and a male friend of Tyecia.

{¶ 5}     When the Turners arrived, Talmadge Turner talked with Wills and tried to calm everyone down.  Turner noticed that Wills had a gun with him, but he did not think Wills would use it.  Eventually, Tyecia McHenry and her friend left in their vehicle.  The Turners, the McJunkinses, G.M., Martin, and Martin's children got into the van to go to the Turners' home.  Talmadge Turner offered Wills a ride to a residence on Otterbein Avenue in Dayton.

{¶ 6}     Talmadge Turner drove the van, and Wills sat in the front passenger seat. In the first row of seats, Carl McJunkins was seated behind Talmadge Turner and Linda Turner was seated behind Wills.   D.W., Martin, T.W., G.M. and Alicia McJunkins were seated in the second row of seats, with T.W. on Martin's lap.

{¶ 7}     During the drive, Wills talked with Martin about his desire to get back together and to see the children.  As the van neared the area where Wills wanted to go, Wills asked Martin, "Was this it?  Is this how it's going to be?"  And, as the van was coming to a stop, Wills asked to hug D.W.  Reluctantly, D.W. was passed up to Wills. Wills took D.W., "jumped" out of the van, got out his gun, and fired several shots at the van while holding D.W.  One shot went through the open front passenger side window and exited the windshield in front of the steering wheel.  One shot hit the front passenger door, and another shot hit the rear passenger door.  A fourth shot hit the rear passenger-side tire. No one was injured.  Talmadge Turner drove away, and the police were contacted.

{¶ 8}     In the early morning hours of July 28, Wills contacted several of Martin's family members, and Wills spoke with them and Detective Jerome Dix.  Wills admitted to

Dix that he (Wills) had shot the vehicle and that he knew that he was going to go to jail for that. Dix repeatedly told Wills that he had to bring D.W. back, but Wills refused. An Amber Alert was issued for D.W., and the police attempted to track Wills's location through his cell phone. Around 9:00 a.m., the SWAT team and hostage negotiation team (HNT) were put on standby. By 11:00 a.m., Dix had narrowed Wills's location to a three-block radius around the 3600 block of Otterbein. Officers began evacuating residences and a daycare in the area. Around noon, both HNT and SWAT were activated to handle the area around Otterbein and to gather additional intelligence about Wills and his (Wills's) location. Wills attempted to mislead officers regarding his whereabouts by stating that he was at an address on Smith Street. Late in the day, Wills agreed to come out with his son; D.W. was unharmed. Sixty-two officers were involved in Wills's apprehension, at a cost of $41,022.23 to the City of Dayton.

{¶ 9} In August 2011, Wills was indicted on felonious assault on Taja Martin (Count 1), felonious assault on T.W. (Count 2), kidnapping of a minor under the age of 13, who was released in a safe place (Count 3), felonious assault on G.M. (Count 4), felonious assault on Alicia McJunkins (Count 5), felonious assault on Carl McJunkins (Count 6), felonious assault on Linda Turner (Count 7), felonious assault on Talmadge Turner (Count 8), discharging a firearm on or near prohibited premises (Count 9), having a weapon while under disability (Count 10), and inducing panic (Count 11). Counts One through Nine each contained a firearm specification. Wills subsequently sought to suppress the statements he made to the police prior to his arrest and the evidence obtained pursuant to a search warrant. The trial court overruled the motion. In March 2012, Wills agreed to enter a guilty plea,

but the trial court allowed him to withdraw his plea prior to sentencing.

{¶ 10}   A bench trial was held on the having weapons while under disability charge, and the matter was tried to a jury on the other ten charges.  The jury found Wills guilty of felonious assault with a firearm specification with respect to Carl McJunkins, Linda Turner, and Talmadge Turner (Count 6, 7, 8), but not guilty of felonious assault as to Taja Martin, T.W., G.M., and Alicia McJunkins (Counts 1, 2, 4, 5).  Wills was found not guilty of kidnapping (Count 3), but guilty of unlawful restraint, a lesser included offense of kidnapping.  The jury further found Wills guilty of discharging a firearm on or near prohibited premises (Count 9), with a firearm specification, and of inducing panic (Count 11).  The jury found that inducing panic resulted in economic harm of "$5,000 but less than $100,000."  The trial court found Wills guilty of having a weapon while under disability (Count 10).

{¶ 11}   The trial court sentenced Wills to five years for each felonious assault, to be served consecutively, plus an additional three years for the firearm specifications (which merged into one firearm specification); 60 days for unlawful restraint; 36 months for discharging a firearm, 24 months for having a weapon while under disability, and one year for inducing panic.  The trial court merged the discharging a firearm offense (Count 9) with one of the felonious assault counts (Count 6).  The court ordered the inducing panic sentence to be served consecutively to the felonious assault sentences, and the having a weapon while under disability sentence to be served consecutively to all other charges.  The court indicated that Wills would get credit for time served on the unlawful restraint charge.  Wills's total sentence was 21 years in prison.

**{¶ 12}** Wills appeals from the trial court's judgment, raising five assignments of error. We will address them in an order the facilitates our analysis.

## II. Sufficiency of the Evidence: Unlawful Restraint and Inducing Panic

**{¶ 13}** In his third assignment of error, Wills claims that "there was insufficient evidence to sustain the convictions for unlawful restraint in Count III and inducing panic in Count XI."

**{¶ 14}** "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). When reviewing whether the State has presented sufficient evidence to support a conviction, the relevant inquiry is whether any rational finder of fact, after viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id.*

### A. Unlawful Restraint

**{¶ 15}** As an initial matter, the State asserts that Wills's claim on his unlawful restraint charge is moot because unlawful restraint is a misdemeanor and he has already served his sentence. "[A]n appeal of a misdemeanor conviction is moot where the defendant voluntarily pays the fine or completes the sentence, unless evidence is offered that the defendant will suffer a collateral disability or loss of civil rights from the conviction."

*State v. Tribble*, 2d Dist. Montgomery No. 18252, 2000 WL 1760690, *1 (Dec. 1, 2000), citing *State v. Berndt*, 29 Ohio St.3d 3, 4, 504 N.E.2d 712 (1987) and *State v. Wilson*, 41 Ohio St.2d 236, 325 N.E.2d 236 (1975). In this case, Wills was incarcerated pending trial, and the trial court gave him credit for time served on the unlawful restraint charge. Under these circumstances, we cannot conclude that Wills voluntarily served his sentence on the misdemeanor charge. Accordingly, his appeal from his unlawful restraint conviction is not moot.

{¶ 16} The State also asserts that Wills's argument is barred by the invited error doctrine. "The doctrine of invited error estops an appellant, in either a civil or criminal case, from attacking a judgment for errors the appellant induced the court to commit. Under that principle, a party cannot complain of any action taken or ruling made by the court in accordance with the party's own suggestion or request." *Royse v. Dayton*, 195 Ohio App.3d 81, 2011-Ohio-3509, 958 N.E.2d 994, ¶ 11 (2d. Dist.), citing *State v. Woodruff*, 10 Ohio App.3d 326, 462 N.E.2d 457 (2d Dist.1983). While the invited error doctrine might have barred an argument that the trial court erred in giving an instruction on unlawful restraint as requested by Wills, the doctrine does not bar an argument that the evidence was insufficient to support the conviction.

{¶ 17} R.C. 2905.03, the unlawful restraint statute, provides that "[n]o person, without privilege to do so, shall knowingly restrain another of the other person's liberty." R.C. 2905.03(A). The term "privilege" means "an immunity, license, or right conferred by law, bestowed by express or implied grant, arising out of status, position, office, or relationship, or growing out of necessity." R.C. 2901.01(A)(12). The jury was instructed

on this definition. Wills claims that he could not be convicted of unlawful restraint because, as D.W.'s father, he had a privilege to restrain his son.

{¶ 18} In *State v. Hill*, 75 Ohio St.3d 195, 206, 661 N.E.2d 1068 (1996), the Supreme Court addressed whether a father could be convicted of kidnapping his child. The court held that R.C. 2905.01(A), in defining the crime of kidnapping, contained no exception for parents. In so stating, the court noted that "[o]ther deprivation-of-liberty crimes, with different elements, specifically exclude parents by use of the term, 'without privilege to do so.'" *Hill* at 206, citing R.C. 2905.02 (abduction); 2905.03 (unlawful restraint); 2905.05 (criminal child enticement); and R.C. 2905.04(C) (child-stealing, repealed in 1996).

{¶ 19} *Hill* concerned a father who had not been married to the child's mother and was not the primary caregiver for his child, the same as in this case, but it did not discuss the extent of such parent's privilege to restrain his or her biological child. Other appellate districts have affirmed convictions for unlawful restraint or abduction (both of which require lack of privilege) by a parent where the jury could reasonably conclude that the restraint involved exceeded the privilege. *See State v. Hornschemeier*, 2012-Ohio-2860, 973 N.E.2d 779 (1st Dist.) (affirming abduction conviction for parent's shackling of her adult child with developmental disablities where evidence supported the jury's "apparent determination that the restraint in this case exceeded any privilege that Mrs. Hornschemeier may have had by virtue of being John's mother"); *State v. Ondic*, 11th Dist. Trumbull No. 2004-T-0015, 2005-Ohio-2261 (evidence supported conviction for abduction when father, who was subject to a custody order, punched mother and took child against mother's wishes).

{¶ 20} Subsequent to *Hill*, the Ohio legislature enacted R.C. 3109.042, which

states, in part: "An unmarried female who gives birth to a child is the sole residential parent and legal custodian of the child until a court of competent jurisdiction issues an order designating another person as the residential parent and legal custodian." Because Wills and Martin were not married at the time of D.W.'s birth, Martin automatically became the residential parent and legal custodian of D.W. by operation of law. *See Dunn v. Marcum*, 2d Dist. Clark No. 2008 CA 112, 2009-Ohio-3015, ¶ 3, citing R.C. 3109.042.

**{¶ 21}** At trial, Martin testified that Wills was the biological father of D.W. and that Wills had signed D.W.'s birth certificate.[1] There had been no court involvement or legal determination of D.W.'s paternity. After Martin and Wills's relationship ended, Martin was the primary caregiver for their two children. Martin permitted Wills to see the children after the break-up; the children were brought to him by Martin's grandparents, the Turners. Wills and Martin do not have a court order establishing custodial rights. The evidence thus supported a conclusion that, even accepting that Wills is D.W.'s biological father, Wills had no "privilege" to restrain D.W. on July 28, 2011.

**{¶ 22}** Even assuming, arguendo, that Wills had certain rights to custody of D.W, the evidence was sufficient to prove that Wills exceeded any privilege he had to take custody of his child. During the overnight hours of July 27 to 28, 2011, the children had been with Martin at Lameycia Martin's Wexford Place residence and, after the confrontation at her sister's residence, Martin got in the van to take the children to her grandparents' home.

---

[1] Prior to 1998, a man was presumed to be the natural father of a child if the man, with his consent, signed the child's birth certificate as an informant. Former R.C. 3111.03(4). Signing the birth certificate as the child's father, along with marrying the child's mother after the child's birth, also raised a presumption of paternity. Former R.C. 3111.03(3). Those provisions were deleted in H.B. 352 (1997).

Wills also got in the van at Talmadge Turner's invitation. Prior to exiting of the van, Wills asked to hug his son. There was no agreement between Martin and Wills that Wills would take D.W., and the evidence reflects that Martin and her relatives did not expect Wills would leave with the child. Nevertheless, after getting D.W. in his arms, Wills jumped out of the van and began firing his gun at the vehicle. The State presented sufficient evidence to support a conclusion that Wills exceeded any privilege he had to restrain D.W. when he obtained and maintained custody without the mother's consent by firing a gun at the child's mother and her family members. Wills's conviction for unlawful restraint was not based on insufficient evidence.

## B. Inducing Panic

{¶ 23} Wills was charged with inducing panic, in violation of R.C. 2917.31(A)(3), which provides: "(A) No person shall cause the evacuation of any public place, or otherwise cause serious public inconvenience or alarm, by doing any of the following: * * * (3) Committing any offense, with reckless disregard of the likelihood that its commission will cause serious public inconvenience or alarm." At the time of the offense, a violation of R.C. 2917.31 that resulted in economic harm of $5,000.00 or more but less than $100,000.00 was classified as a fourth-degree felony. R.C. 2917.31(C)(4)(b). (This statute was amended September 30, 2011 to increase the amounts for a fourth-degree felony to $7,500 and $150,000, respectively.[2]) Economic harm includes "[a]ll costs incurred by the state or any political subdivision as a result of, or in making any response to, the criminal conduct

---

[2] Neither party raised this distinction at trial, sentencing, or on appeal. The evidence was not disputed that law enforcement incurred economic harm of over $40,000. Further, Wills was sentenced to one year on this offense, which is in the range of both fourth- and fifth-degree felonies.

that constituted the violation of this section or section 2917.32 of the Revised Code, including, but not limited to, all costs so incurred by any law enforcement officers, firefighters, rescue personnel, or emergency medical services personnel of the state or the political subdivision."   R.C. 2917.31(E)(1)(b).

**{¶ 24}**   At trial, the State argued that Wills committed the offense of inducing panic when he failed to return the child that he had kidnapped, which resulted in the SWAT and the HNT teams being called out and the evacuation of surrounding buildings.   The evidence, construed in the light most favorable to the State, reflects that Wills had been armed with and discharged a firearm, that Wills took D.W. while shooting at a van containing the child's mother, sister, and other relatives, and that Wills admitted to police officers that he had shot at the van.   The police had no way of knowing whether D.W. was in danger, despite Wills's assurances to the police that his son was fine.   Wills had several opportunities to return the child safely on July 28, 2011, but he refused to do so.   Wills's continued restraint of his son and his refusal to return the child resulted in the Dayton police department's activation of its SWAT and HNT teams and evacuation of residences and a daycare center near Wills's location.   Sixty-two officers were involved, at a cost of approximately $42,000.   The evidence was sufficient to prove that Wills caused the evacuation of surrounding residences by unlawfully restraining his son, with reckless disregard of the likelihood that his refusal to return D.W. would cause serious public inconvenience or alarm.

**{¶ 25}**   The third assignment of error is overruled.

### III. Imposition of Consecutive Sentences

**{¶ 26}** Wills's first assignment states, "The trial court erred when it imposed consecutive sentences without making findings required by R.C. 2929.14(C)(4)."

**{¶ 27}** In his first assignment of error, Wills claims that the trial court erred in requiring Counts Six, Seven, Eight, Ten, and Eleven to be served consecutively without making the findings required by R.C. 2929.14(C)(4).

**{¶ 28}** R.C. 2929.14(C)(4) permits a trial court to impose consecutive sentences if it finds that (1) " the consecutive service is necessary to protect the public from future crime or to punish the offender," (2) "consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public," and (3) any of the following applies:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

**{¶ 29}** "The trial court is not required to give reasons explaining these findings, nor is the court required to recite any 'magic' or 'talismanic' words when imposing consecutive sentences. * * * Nevertheless, the record must reflect that the court made the findings required by the statute." *State v. Temple*, 2d Dist. Clark No. 2012-CA-65, 2013-Ohio-3843, ¶ 21, quoting *State v. Hubbard*, 10th Dist. Franklin No. 11AP-945, 2013-Ohio-2735, ¶ 86.

**{¶ 30}** In Wills's case, the trial court made the following statements before imposing sentence:

> * * * The Court finds that your behavior on or about the date of July 28, 2011 to be extremely outrageous, sir. The Court believes that it was outrageous for several reasons. 1) You shot at the mother of your two children. You shot at this mother with [sic] you also shot at one child. One of your children was in the car or in the van. And you shot at the van that had seven people in it while holding one of your children.
>
> The Court also finds that it's equally outrageous when it looks at the presentence investigation and you along with your mother profess that you only had your children's interests in mind. I don't know of any parent who is a responsible parent who shoots at the mother of the children, shoots at the children, or is holding a child while he or she is in a situation, even if you're very angry with that parent. So I find that extremely outrageous.
>
> And I also find that this situation revolved or resolved from an issue of control as opposed to caring.

{¶ 31} The State asserts that the findings necessary for the imposition of consecutive sentences are "implicit in the court's remarks at sentencing." While the trial court was not required to recite the exact language of R.C. 2929.14(C)(4), the trial court was nevertheless required to make the specific findings required by the statute, and we are hesitant to impute our interpretation to the trial court's comments. As explained by the Eighth District:

> [N]ot requiring slavish adherence to the specific wording of the statute is not the same as relieving the court of the duty to make the required "findings." R.C. 2929.14(C)(4) requires the court to make specific "findings." In the past, we have found those findings can be implicit in context when the court's statements during sentencing are intended to encompass the relevant provisions of the sentencing statutes. But in doing so, we have arguably frustrated the purposes underlying the requirement for findings as a predicate for ordering consecutive sentences.

> The supreme court has recognized that "Ohio appears to be unique in having a rule that sentences of imprisonment shall be served concurrently." The imposition of consecutive sentences in Ohio is thus an exception to the rule that sentences should be served concurrently. And there is no doubt that the provisions of H.B. 86, like those of S.B. 2 before it, were intended, among other things, to alleviate overcrowding in the prison system.

> By imposing a requirement that the trial judge make specific findings before ordering sentences to be served consecutively, the General Assembly

toughened the standard for consecutive sentences. However, the revived consecutive sentencing statute codified in R.C. 2929.14(C)(4) does not place a heavy burden on a trial judge. Indeed, it is arguably easier to impose consecutive sentences today than it was under former R.C. 2929.14(E)(4) because the revived version did away with the requirement that the court justify its findings by giving reasons for making those findings.

Because the statute so clearly requires specific findings for the imposition of consecutive sentences, those findings must be entered at the time the court orders sentences to be served consecutively. What we mean by this is that regardless of what the trial judge might say during sentencing regarding the purposes and goals of criminal sentencing, compliance with R.C. 2929.14(C)(4) requires separate and distinct findings in addition to any findings relating to purposes and goals of criminal sentencing. Too often, we have been called to examine words or phrases scattered throughout a sentencing transcript and piece them together to decide whether the court made the required findings. * * * If the word "findings" is to have any meaning at all, it means nothing less than the court must "engage[ ] in the required analysis and select[ ] the appropriate statutory criteria" before ordering sentences to be served consecutively. Only then will the imposition of consecutive sentences not be contrary to law.

*State v. Venes*, 2013-Ohio-1891, 992 N.E.2d 453, ¶ 14-17 (8th Dist.).

**{¶ 32}** In Wills's case, the trial court expressed its understandable and supportable

opinion that Wills's actions were "extremely outrageous," but it failed to make the findings necessary for the imposition of consecutive sentences.[3] *Contrast State v. Barker*, 8th Dist. Cuyahoga No. 99320, 2013-Ohio-4038, ¶ 11-16; *Temple*, 2d Dist. Clark No. 2012-CA-65, 2013-Ohio-3843. Wills's assignment of error is sustained. As a remedy, the matter will be remanded to the trial court to consider whether consecutive sentences are appropriate under R.C. 2929.14(C)(4) and, if so, to enter the proper findings on the record.

## IV. Allied Offenses of Similar Import

{¶ 33} In his second assignment of error, Wills claims that "the trial court erred when it failed to merge Wills's convictions for Counts III, VI, VII, VIII, X, and XI."

{¶ 34} R.C. 2941.25 provides that:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses,

---

[3] Without engaging in an exegesis of Ohio sentencing laws, we note that some interpretations of the current version would affirm a sentence in which the court rotely verbalizes the statutorily-prescribed conclusory findings; other interpretations would accept factual explanations and infer the conclusory requirements; and still others would approve a silent record as compliance with certain statutory and constitutional mandates. It would seem the best course, for the benefit of both the State and the defendant, is to make as complete a record as possible, especially when imposing consecutive sentences.

and the defendant may be convicted of all of them.

{¶ 35} "When determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25, the conduct of the accused must be considered." *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 106, syllabus. The Ohio Supreme Court explained:

* * * [T]he question is whether it is possible to commit one offense and commit the other with the same conduct, not whether it is possible to commit one without committing the other. * * * If the offenses correspond to such a degree that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import.

If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., "a single act, committed with a single state of mind." * * *

If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged.

Conversely, if the court determines that the commission of one offense will never result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R.C. 2941.25(B), the offenses will not merge.

(Citations and quotations omitted.) *Johnson* at ¶ 47–51.

{¶ 36} The defendant bears the burden to prove entitlement to merger. *State v.*

*Jackson*, 2d Dist. Montgomery No. 24430, 2012-Ohio-2335, ¶ 134, citing *State v. Thomas*, 10th Dist. Franklin No. 10AP-557, 2011-Ohio-1191, ¶ 16.

{¶ 37} Wills claims that his convictions for felonious assault, unlawful restraint, having a weapon while under disability, and inducing panic should have been merged. We disagree. According to the State's evidence, Wills possessed a gun while at the Wexford Place address and while in the van. Thus, he committed the offense of having a weapon while under disability prior to any of his actions related to taking D.W. and shooting the gun. In addition, Wills shot four bullets at a van containing seven people; the three felonious assault charges of which he was convicted concerned three different victims. We have recognized that separate convictions and sentences are permitted when a defendant's conduct results in multiple victims. *See*, *e.g.*, *State v. Smith*, 2d Dist. Montgomery No. 24402, 2012-Ohio-734, ¶ 19; *State v. Skaggs*, 2d Dist. Clark No. 10-CA-26, 2010-Ohio-5390. Wills's conviction for unlawful restraint concerned his restraint of D.W., an act that was subsequent to and distinct from his firing a gun at Martin and her relatives. Finally, Wills's inducing panic conviction concerned the need to evacuate the area to effectuate his apprehension. Again, the actions and animus required for this offense were separate and distinct from his other offenses.

{¶ 38} Wills's second assignment of error is overruled.

### V. Restitution

{¶ 39} Wills's fourth assignment of error states, "The trial court erred in ordering restitution when nothing in the record indicates the defendant has the present or future ability to pay the restitution."

**{¶ 40}** Under R.C. 2929.18(A)(1), a trial court may order a defendant to pay restitution as a financial sanction. An order of restitution must be made in open court, and the trial court must determine the amount of restitution at sentencing. *Id.* The court may "base the amount of restitution it orders on an amount recommended by the victim, the offender, a presentence investigation report, estimates or receipts indicating the cost of repairing or replacing property, and other information, provided that the amount the court orders as restitution shall not exceed the amount of the economic loss suffered by the victim as a direct and proximate result of the commission of the offense." *Id.* The court must hold a hearing on restitution only if the offender, victim, or survivor disputes the amount. *Id.*

**{¶ 41}** When imposing financial sanctions, a trial court must consider an offender's present and future ability to pay. R.C. 2929.19(B)(5); *State v. Croom*, 2d Dist. Montgomery No. 25094, 2013-Ohio-3377, ¶ 93. R.C. 2929.19(B)(5) "does not require a hearing and is devoid of any particular factors for the court to take into consideration in making its determination." *State v. Twitty*, 2d Dist. Montgomery No. 24296, 2011-Ohio-4725, ¶ 23. The trial court may comply with its obligation by considering a presentence investigation report, which includes information about the defendant's age, health, education, and work history. *State v. Ratliff*, 194 Ohio App.3d 202, 2011-Ohio-2313, 955 N.E.2d 425, ¶ 12 (2d Dist.).

**{¶ 42}** Although perhaps preferable, a trial court need not make express findings on the record about a defendant's ability to pay a financial sanction. *State v. Miller*, 2d Dist. Clark No. 08-CA-90, 2010-Ohio-4760, ¶ 38, citing *State v. Ayers*, 2d Dist. Greene No.

04-CA-34, 2005-Ohio-44. All that is required is that the trial court consider the defendant's ability to pay. *Miller* at ¶ 38.

{¶ 43} The presentence investigation report indicated that Wills was 39 years old, he had received his GED in 1995 while incarcerated on a prior offense, and he reported receiving a certificate in building maintenance. Wills had indicated that he had been employed prior to his incarceration on the instant offenses, and that he had previously been employed with the same company for five years between 2004 and 2009. Wills did not receive public assistance and he considered himself to be self-supported. At the time of the report, Wills was not employed due to his incarceration.

{¶ 44} At sentencing, the trial court ordered Wills to pay restitution of $42,000 for the manpower that was required related to the inducing panic charge and $350 to Linda Turner for damage to the church van. While imposing the inducing panic sentence, the court stated that it "makes a finding with regard to the Defendant's apparent present ability to make payments and make payments once he is released and the Court is going to order that the $42,000 that came out with regard to the manpower will be assessed to the Defendant." At the conclusion of sentencing, Wills's defense counsel told the court that Wills had executed an affidavit of indigency "with respect to the restitution figures" and that he would be filing the affidavit on behalf of his client. The affidavit of indigency was filed on August 17, 2012, after the sentencing hearing but before the court's judgment entry was filed.

{¶ 45} Wills claims that the record is devoid of evidence that he has a present or future ability to pay restitution. Contrary to this assertion, the PSI reflects that Wills has a

GED, that he has been employable, and that he was able to maintain employment for a number of years. Although Wills was sentenced to a lengthy sentence, the trial court did not abuse its discretion in concluding that Wills had a future ability to obtain employment and pay restitution upon his release from prison.

{¶ 46} Wills stated in his affidavit of indigency that he had no assets or income and that he had no "present or immediate future financial ability to pay any mandatory fines. I am indigent." Even assuming that the affidavit was timely submitted, these averments do not demonstrate an abuse of discretion in the trial court's finding that Wills would have an ability to pay once he is released from prison.

{¶ 47} The fourth assignment of error is overruled.

## VI. Court Costs

{¶ 48} Wills's fifth assignment of error states that "[t]he trial court erred by imposing court costs in the sentencing entry without imposing court costs at the sentencing hearing." The State agrees, and the record reflects, that the trial court did not mention court costs at sentencing and that the case should be remanded for the proper imposition of court costs.

{¶ 49} Wills's fifth assignment of error is sustained.

## VII. Conclusion

{¶ 50} Wills's sentence will be reversed, and the matter will be remanded to the trial court for the proper imposition of court costs and for the trial court to consider whether consecutive sentences are appropriate under R.C. 2929.14(C)(4) and, if so, to enter the proper findings on the record. In all other respects, the trial court's judgment will be

affirmed.

. . . . . . . . . .

DONOVAN, J. and WELBAUM, J., concur.

Copies mailed to:

Carley J. Ingram
Robert Alan Brenner
Hon. Frances E. McGee